**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**WESTERN DIVISION**

| | | |
|---|---|---|
| In re Cherie Lynne Vraney, | ) | Bankruptcy Case 18-82365 |
| | ) | |
| Debtor. | ) | |
| | ) | |
| ——————————————— | ) | |
| | ) | |
| Deborah Aeschliman, | ) | |
| | ) | Adversary No. 19-96005 |
| Plaintiff, | ) | |
| v. | ) | Chapter 7 |
| | ) | |
| Cherie Lynne Vraney, | ) | Judge Thomas M. Lynch |
| | ) | |
| Defendant. | ) | |

## <u>MEMORANDUM OPINION</u>

Deborah Aeschliman and the Debtor worked together to launch a wellness center and spa in Loves Park, Illinois. Their shop, the "Healthy Habits Wellness Boutique," opened in January 2017. By June of that year, however, things were not going well. The parties had a falling out and the Plaintiff left the business at the Debtor's request.

On October 31, 2018, Ms. Vraney filed her petition for relief under chapter 7 of the Bankruptcy Code. Among her assets, she listed a "possible claim against Ex-Business Partner" for an "Unknown" amount and further indicated that the spa's landlord may have a claim of "Unknown" value against the bankruptcy estate. Finding no assets to administer, the case trustee filed his final report and a discharge issued and the bankruptcy case closed on April 8, 2019.

Before then, Ms. Aeschliman brought this adversary proceeding to except from

discharge certain amounts the Debtor "may owe to Plaintiff" relating to Healthy Habits. (Complaint ¶¶ 10-15.)  Ms. Aeschliman bases her action on claims that the Debtor ousted her from the business, locked her out of the premises and wrongfully retained certain property the Plaintiff  had contributed to the venture.   In addition, the plaintiff also seeks to except from discharge alleged "damage[s] by reasons [sic] of the misrepresentation in legal exposure," (*id.* ¶ 20), which at trial was revealed to mean the amount the Plaintiff paid to Healthy Habits' landlord settle its claim against Ms. Aeschliman under her guaranty of the premises lease.  In Count I of the complaint, the Plaintiff asserts that the settlement payment together with losses attributed to vague allegations of misrepresentations and promises by the Debtor regarding ownership of Healthy Habits should be excepted from discharge as debts fraudulently induced by the Debtor under section 523(a)(2)(A). (*Id.* ¶¶ 16-17, 20.)  In Count II, entitled "Conversion", the Plaintiff alleges that in the course of "lock[ing] out" the Plaintiff, the Debtor acted "wanton[ly], willful[ly], and malicious[ly]," by retaining property Ms. Aeschliman had contributed to the business despite her demand for its return. (*Id.* ¶¶ 8, 16, 19.)  The Plaintiff claims a resulting debt of undisclosed value that is nondischargeable under section 523(a)(6).

After trial held on November 5, 2019, the court finds that the Plaintiff failed to meet her burden of demonstrating she is owed a non-dischargeable debt.

## JURISDICTION

Discharge being a right expressly created by title 11, proceedings on an objection to a debtor's discharge or to the dischargeability of a debt are found to arise

in a case under title 11. *Kontrick v. Ryan*, 540 U.S. 443, 447–48 (2004).  Accordingly, this court has jurisdiction to entertain this matter pursuant to 28 U.S.C. § 1334 and Internal Operating Procedure 15(a) of the United States District Court for the Northern District of Illinois.  The determination of the dischargeability of a particular debt is a core proceeding under 28 U.S.C. § 157(b)(2)(I), and actions to determine the scope of a debtor's discharge is a fundamental part of the bankruptcy process.  As such, this court possesses "constitutional authority to hear and finally determine what claims are non-dischargeable in a bankruptcy case." *Muhummad v. Reed (In re Reed)*, 542 B.R. 808, 815 (Bankr. N.D. Ill. 2015). *See also, e.g., In re Yotis*, 521 B.R. 625, 631 (Bankr. N.D. Ill. 2014) (citing *Stern v. Marshall*, 564 U.S. 462, 499 (2011)).[1]

## FINDINGS OF FACT

The court has considered the evidence and arguments presented by the parties at the trial and reaches this decision after careful consideration of the substance and credibility of the testifying witnesses and the exhibits admitted in evidence, and any reasonable inferences to be drawn therefrom, together with the stipulations of the parties.  The court has also taken judicial notice of the contents of the docket in this matter and the underlying bankruptcy case when appropriate. *See Levine v. Egdi*, No. 93 C 188, 1993 WL 69146, at *2 (N.D. Ill. Mar. 8, 1993) (authorizing a bankruptcy court to take judicial notice of its own docket).  From its review, this court determines

---

[1] Additionally, both parties affirmed in open court their consent to this court's authority to enter final orders in this matter on September 23, 2019. *See Wellness Int'l Network, Ltd. v. Sharif*, 575 U.S. 665, ___, 135 S. Ct. 1932, 1949 (2015) ("Article III permits bankruptcy courts to decide *Stern* claims submitted to them by consent.").

the salient facts to be and so finds as follows.[2]

     **Previous business experience.** It is not disputed that the Debtor had scant business experience before the Healthy Habits venture. On the other hand, the Plaintiff had owned at least two other businesses in a similar line of activity before Healthy Habits. It was through one of Ms. Aeschliman's earlier businesses that the two met. Shortly after the Debtor finished esthetics school and on the recommendation of a mutual acquaintance, the Debtor began working at another spa and wellness center owned by the Plaintiff. According to the Plaintiff, the Plaintiff testified that she "had some extra space at [her] shop"[3] and let the Debtor "work out of there." Although the testimony given at trial left unclear the exact nature of the parties' working arrangement at the old shop, both parties' statements suggested that the Debtor worked independently out of a portion of the shop rather than as an employee of Ms. Aeschliman's. The Plaintiff testified that during this time she did not charge the Debtor for her use of the shop and provided her equipment and product in the hope that Ms. Vraney could build up her clientele so that they could eventually open another business at a bigger location. Less than a year later, the Debtor undertook to form the new Healthy Habits shop at a location about a mile away.

---

[2] The following sets forth the court's findings of fact as required by Fed. R. Bankr. P. 7052. To the extent any findings of fact constitute conclusions of law, they are adopted as such, and to the extent that any conclusions of law constitute findings of fact, they are adopted as such. Adjudicative facts may also be found and determined later in this Memorandum Opinion.

[3] The record of the proceedings in open court was created and preserved by the court's digital recording systems, said recordings being available to the parties, the court and the court's personnel. The parties have not requested that this record be reduced to a written transcript. The brief quotations from the testimony of witnesses found occasionally in this decision were crossed-checked for accuracy against these recordings.

**Organization and Ownership of Healthy Habits.**  The testimony at trial was less than clear regarding the Debtor's arrangement with the Plaintiff with respect to the new shop.  Ms. Vraney testified that the Plaintiff's old location "wasn't that great" and that she was getting ready to venture out on her own.  It was at that time, according to the Debtor, when "Healthy Habits Wellness Boutique kind of came into the picture." The evidence shows that the Debtor formed Healthy Habits Wellness Boutique, LLC, ( "Healthy Habits") on or about April 11, 2016, listing herself as its sole member.  The Debtor testified she never drew a salary from Healthy Habits.

The Plaintiff testified that she believed they would be business partners in the new business, "50/50 partners" as she put it.  However, at trial she admitted that she knew the Debtor "did the LLC" and acknowledged that she had seen the formation documents for the limited liability company at or about the time of its organization and was aware that they did not indicate that she owned or had an interest in the company. Ms. Aeschliman testified that she wanted her name "off the business" because of a tax issue she faced.

The Plaintiff admitted that there was no written agreement with the Debtor regarding any interest in the business.[4]  The Plaintiff testified that she believed she was a part owner of the business.  But she did not recall ever seeing an operating agreement for Healthy Habits and admitted that she and the Debtor never discussed

---

[4] The Plaintiff testified very generally that "50/50 was how we always discussed it," but gave no details as to when any of these supposed "discussions" took place or what exactly the Debtor supposedly said, leaving unclear, for example, whether the alleged discussion related to proportional ownership and profit sharing or to how the leased space and common expenses were to be shared for the separate respective business ventures.

capital contributions and they never conducted an accounting of the business. She knew her name was not on the business' premises lease. Although by her own account an experienced businessperson, the Plaintiff offered no corroborative proof of her alleged interest in the company. Nor did the parties furnish any factual evidence of any specific proposal or representation by the Debtor regarding the Plaintiff's alleged interest in Healthy Habits.

Healthy Habits operated out of retail space in Loves Park, Illinois, which it rented from Diamond Star, LLC under a seven-year lease agreement. Executed on April 26, 2016, the lease provided for rent consisting of a monthly base amount plus a proportional share of common insurance, expenses, real estate taxes and heating and cooling costs. It granted the tenant the right to request reimbursement for initial buildout improvements capped at $10,000. Both the Debtor and the Plaintiff gave the landlord separate personal guarantees of the Healthy Habits lease on April 26. Each guaranty expressly stated that it "may not be changed, modified, discharged or terminated orally or in any manner other than by agreement in writing signed by the Guarantor and the Landlord." (Pl. Ex. 2, 3.)

Based on the records and testimony presented at trial, the court finds that the Plaintiff contributed to the business $10,737.21 in cash, checks and money orders deposited into Healthy Habits' business account during her involvement with Healthy Habits. (Pl. Exs. 6, 7.) In addition, the Plaintiff testified without objection to paying $628.92 from her personal account in expenses for inventory on behalf of

Healthy Habits between December 2016 and March 2017,[5] resulting in a total monetary contribution of $11,366.13.  The evidence further shows that at the same time the Debtor contributed at least $36,337.22[6] to the business, together with an additional $9,215.17 from her personal account during the startup of the limited liability company, for a total monetary contribution of $45,552.39. (Pl. Ex. 8.)  Ms. Aeschliman further claimed at trial that she contributed additional equipment and inventory to the new business, vaguely mentioning as examples towel warmers, massage tables and shampoo.  However, she furnished little factual information about these items and no testimony about their quantity or value.  Further, the Plaintiff identified no specific items that were not returned to her following her "ouster" from the business.

The parties testified that from May 2016 through December 2016 they renovated the premises leased for the new business.  It appears that both were involved in planning the renovation work which was designed by an architect referred

---

[5] The Plaintiff also testified that she had multiple credit card charges for a variety of things for another $9,000 "worth of stuff that I paid for." Ms. Aeschliman's vague references to paying "the tapper guy" for the kombucha device or for "the floors to be polished" being noted, she nevertheless offered no receipts or other supporting proof nor any detail, foundation, dates or amounts to support this claim. As such, her vague and conclusory testimony on this point, unsupported as it is by any evidence which should have been readily available to the owner of the charge cards, an experienced business person, is of little credibility and fails to demonstrate what, if anything, she contributed to the business in addition to the amounts described above.

[6] The Debtor testified that she contributed $46,337.22, but the record showed that $10,000 of that consisted of a $10,000 buildout expense refund from the landlord directly to the LLC.  The Debtor argued such payment should be considered a contribution from her because she contributed a much larger share of the build-out expenses.  But, she did not testify that she contributed *all* of the expenses attributable to the refund, and more importantly, it is not clear from the record that the other $36,337.22 in contributions do not include such expenses such that adding it would result in double-counting.  In any event, the additional $10,000 is not material to the issues raised in this proceeding, as even the $36,337.22 is greater than the sum of the Plaintiff's undisputed contributions.

by the leasing agent and carried out by a general contractor with whom the Plaintiff was familiar.

The business opened in January 2017. Although both worked at the business, the Plaintiff testified that each "did different things." Ms. Aeschliman's efforts appear to have focused on internet sales and on sales of kombucha tea, while the Debtor concentrated on providing facial treatments to customers and handling sales of skin care, massage and "esthetic" products. As Ms. Aeschliman described it, the the Debtor "mainly did" the point of sale business. However, she admitted that she "could get in and look at things" whenever she wanted, but rarely did so because, according to the Plaintiff "that's never been my strength." No evidence was presented that Healthy Habits ever realized any profits or that the Plaintiff or the Debtor ever received a salary or received any distribution from the business' receipts.

**The "Ouster."** The Plaintiff testified that on June 15, 2017, the Debtor stepped into Ms. Aeschliman's office to tell her to take her things and to leave. Ms. Aeschliman's account of this key event was sparse. According to the Plaintiff, the Debtor was angry during the meeting and accused the Plaintiff of being "a bully". Stunned to be told to vacate the premises, the Plaintiff testified, she left without protest. Ms. Aeschliman testified that she gathered her computer and files, returned her corporate bank card and departed, understanding that she was both physically vacating the premises and leaving the business. While the Debtor testified generally that from time to time disagreements arose and there was "definitely friction" between the parties, neither party offered the court much if any explanation for what

led to the June 15 confrontation.

Neither disputes that the Plaintiff left the business without protest.  Ms
Aeschliman testified that the Debtor later asked her to return to "come and get the
things . . . that [she] brought . . . from the old store."  She testified that she was
permitted to return to the premises the following weekend to gather anything she
had left behind.  She returned to the premises on June 18, 2017, joined by her
husband and some friends, to retrieve the inventory that she had brought from the
old building that she could identify.  She did not take any new inventory purchased
after Healthy Habits opened.  The Debtor was present, but they said little to one
another that day.  Ms. Aeschliman did not suggest that the Debtor prevented her
from taking anything from the premises.

On June 19th, the Debtor conducted a walkthrough of the shop to identify any
remaining items thought to belong to the Plaintiff.  The Debtor wrote to Ms.
Aeschliman on or around the 29th to inform her that she had placed these items
behind the shop where Ms. Aeschliman could pick them up.  On July 9th, the Plaintiff
returned to the premises to retrieve at least some of the items, leaving some behind,
including a motorized chair among other things.  She testified she left some items
behind because "they had been rained on."  The Plaintiff failed to further identify
these items or present evidence about their value.  The Debtor disputes leaving in the
rain items to be retrieved.  At trial, Ms. Aeschliman did not identify any items that
she claims which Debtor prevented her from retrieving, and the Plaintiff failed to
prove that the Debtor intentionally left items in the rain or otherwise prevented the

Plaintiff from retrieving items thought to belong to her.

**Debtor's Release.** As the Plaintiff was about to leave on June 18th, the Debtor handed her a document entitled "Personal Guarantee Release" signed by the Debtor. It stated:

> I, Cherie Vraney, do hereby release, Deborah Aeschliman, from her personal guarantee agreement with Diamond Star LLC and Stenstrom Real Estate Development Group.
> I, Cherie Vraney, do hereby assume full responsibility for the lease agreement with Diamond Star LLC and Stenstrom Real Estate Development Group.

(Pl. Ex. 4.) The Plaintiff signed the Personal Guarantee Release agreement on June 18, 2017, and her son then added his signature to it as a witness. The document was not signed by the landlord nor does it contain a signature block for it. However, it bears the notation "CC'd to Todd Isaacs, Property Manager." It is not disputed that before she asked Ms. Aeschliman to sign the Personal Guarantee Release, Ms. Vraney told the landlord's property manager during a telephone conversation that the Plaintiff was leaving the business. She and the manager did not discuss the release. The Debtor later hand delivered the document signed by Ms. Aeschliman to the landlord. There is no evidence that the landlord ever accepted or signed it.

The Plaintiff did not show that she had requested the Personal Guarantee Release from the Debtor or gave Ms. Vraney consideration in exchange for it. The Debtor testified that she had prepared the Personal Guarantee Release in an attempt to relieve the Debtor of responsibility for the lease in the event the business failed.

The Plaintiff claimed to understand at the time she signed it that the document would release her from liability to the landlord. However, her personal

guaranty given to the landlord, of which she admitted being familiar, provides that its amendment, modification, discharge or termination must be in writing signed by the landlord.  The Plaintiff did not establish that the Debtor had represented to her that the landlord had agreed to the release, only responding "yes" when asked "if Todd knew about the document."[7]  Instead, Ms. Aeschliman stated that the Debtor told her "it was a legit document."

The Plaintiff testified that she asked the Debtor around this time if she would ever be paid for her time and monetary contributions to the business.  She testified that Ms. Vraney told her that she would not be.

**Postscript to the Business.**  The business ceased operating on or around February 9, 2018.  At that time, according to Ms. Vraney, Healthy Habits was three months behind in its rent.  Neither party offered any proof as to what other debts, if any, the business owed its creditors when it closed.  The Debtor opened a similar shop in the vicinity at the end of April 2018.  The Plaintiff testified that after leaving the business she, in her words, "sat around and ate cake for about four months" before deciding to consult with an attorney.  The landlord eventually brought a lawsuit against Ms. Aeschliman for unpaid rent based on her personal guaranty.  Settling the action on April 10, 2019, the Plaintiff agreed to pay the landlord $12,000.

The Debtor filed her voluntary petition for relief on October 31, 2018.  She listed the landlord Diamond Star LLC as having a claim of "unknown" value and did not list the Plaintiff among her creditors.  The chapter 7 Trustee concluded that there

---

[7] When asked if the Debtor said the property manager had "seen" the document, the Plaintiff testified that "I don't believe we got into anything further than 'yes.'"

were no assets for distribution and the bankruptcy case closed with discharge on April 8, 2019.

## DISCUSSION AND CONCLUSIONS OF LAW

### 11 U.S.C. § 523(a)(2)(A).

Section 523(a)(2)(A) excepts from discharge any debt "for money, property, services, or an extension, renewal, or refinancing of credit, to the extent obtained by- -(A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A). To obtain a determination of nondischargeability under this section the creditor must first prove that the debtor owes him a debt. *In re Reed*, 542 B.R. at 826. Meeting that requirement, the plaintiff must then demonstrate that the debt falls within one of the three grounds specified under subpart (a)(2)(A): false pretenses, false representation or actual fraud. *Id.* Where, as here, the plaintiff asserts that the debt is based on a false representation or omission, she must demonstrate: (1) that the debtor made a false representation or omission, which she either knew was false or made with reckless disregard for the truth; (2) that the debtor possessed an intent to deceive or defraud; and (3) that the creditor justifiably relied on the false representation. *Reeves v. Davis* (*In re Davis*), 638 F.3d 549, 553 (7th Cir. 2011).

An actionable misrepresentation under this subsection can be demonstrated not only by a spoken or written statement, but also by conduct, including the debtor's silence or omission regarding a material fact. *In re Ryan*, 408 B.R. 143, 157 (Bankr. N.D. Ill. 2009) ("A debtor's failure to disclose pertinent information may be a false

representation where the circumstances imply a specific set of facts and disclosure is necessary to correct what would otherwise be a false impression."). In contrast, false pretense may include implied misrepresentations or conduct "intended to create or foster a false impression." *Media House Productions, Inc. v. Amari (In re Amari)*, 483 B.R. 836, 846 (Bankr. N.D. Ill. 2012).

Under either theory, the plaintiff must demonstrate justifiable reliance. That element requires that the creditor did not "blindly rely upon a misrepresentation the falsity of which would be patent to him if he had utilized his opportunity to make a cursory examination or investigation," and does not impose upon the creditor a "duty to investigate unless the falsity of the representation would have been readily apparent." *Ojeda v. Goldberg*, 599 F.3d 712, 717 (7th Cir. 2010). The standard is subjective and "determined by looking at the circumstances of a particular case and the characteristics of a particular plaintiff." *Id.*

At the outset, we note that it is not disputed that during the time at issue for this adversary proceeding, Healthy Habits operated as an Illinois limited liability company. As such, the business is a legal entity distinct from its "shareholders, officers, and directors." *In re Walker*, No. 09-40935, 2010 WL 2044950, at *2 (Bankr. S.D. Ill. May 24, 2010). In Illinois "the debts, obligations, and liabilities of a limited liability company are solely the debts, obligations, and liabilities of the company"; a member of the LLC "is not personally liable for a debt, obligation, or liability of the company solely by reason of being or acting as a member or manager." *In re Collazo*, 817 F.3d 1047, 1052 (7th Cir. 2016) (citing 805 ILCS 180/10-10(a)). The Debtor's

claim for the alleged "lost value of her work" was shown at trial to be nothing more than an unsupported claim for unpaid wages of an unknown amount. The Plaintiff failed to present or pursue any veil-piercing theory or evidence of misrepresentation to show that this alleged debt is anything more than a liability of the company. Accordingly, it cannot be a debt excepted from the Debtor's discharge.

In her claim for relief under section 523(a)(2)(A), Ms. Aeschliman next alleges that the Debtor "made various representations and promises regarding Plaintiff's co-ownership of Healthy Habits, Defendant knew that Defendant did not intend to fulfill." (Complaint ¶ 16.)  The company was organized without the Plaintiff registered in its formation papers *at the request of the Plaintiff.* The evidence does not show an instance going forward of Ms. Aeschliman justifiably relying on a misrepresentation by Ms. Vraney when she furnished inventory or funds in support of the business or signing her personal guaranty in support of the business' premises lease.

In particular, Ms. Aeschliman fails to establish that the statements about the Personal Guarantee Release attributed to the Debtor support a claim of non-dischargeability. The weight of the evidence does not establish that the Debtor made any false representation or omission about it within the scope of section 523(a)(2)(A). Rather, the evidence shows that on June 18, 2017, the Debtor showed a writing entitled Personal Guarantee Release to Ms. Aeschliman, telling the Plaintiff that the instrument was "legit" and that the property manager "knew about" it.  As discussed above, the Personal Guarantee Release states that the Debtor releases the Plaintiff

from her guaranty given to the landlord and that Ms. Vraney assumes "full responsibility" for the lease agreement. By the time these alleged statements were made, the Plaintiff had already left the business. There was no testimony that Ms. Aeschliman had asked that the Plaintiff for a release or even that she was expecting to receive the instrument. The Plaintiff has not identified any money, property, services, or an extension, renewal, or refinancing of credit that the Debtor obtained on the basis of the statements. The terms of the release do not impose any obligation upon the Plaintiff, and the Plaintiff has not identified any consideration she gave or promised in return for it.

The weight of the evidence does not show that the statements about the instrument were known to be false by the Debtor at the time they were made. The Plaintiff failed to show that the Debtor knew that the Personal Guarantee Release was not binding as between her and Ms. Aeschliman. Although nothing in the instrument states that the landlord releases the Plaintiff from her obligations under the guaranty or that the landlord will not sue the Plaintiff, there was no evidence showing that the Debtor succeeded in or attempted to enforce any liability or subrogation rights in connection with the lease against the Plaintiff. Nor did the bankruptcy estate assert any such claim against the Plaintiff.

The Debtor testified credibly that she drafted the release herself without aid of counsel, that she wrote it in an attempt to let the Plaintiff "off of [the lease]," that she gave a copy of the release to the landlord after the Plaintiff signed it and that she thought it would be accepted and was effective as of June 18, 2019. The Plaintiff did

not dispute this testimony.

Finally, the Plaintiff did not show that she relied upon the Debtor's statements about the Personal Guarantee Release, let alone that any reliance upon conclusions about the legal effect of the release offered by a recent esthetics school graduate with substantially less business experience was justifiable. There is no dispute that the Plaintiff had the opportunity, indeed the responsibility, to review the terms of her written guaranty before she signed it and gave it to the landlord. It is undisputed that any modification to that instrument required the signature of the landlord. The Plaintiff offered no proof that the Debtor told her that the landlord had signed any document releasing or modifying the Plaintiff's guaranty. Indeed, Ms. Aeschliman did not suggest in her testimony that she so much as asked Ms. Vraney for such a document or even if that had occurred. Nor did the Plaintiff attempt to explain how the court could find it justifiable for her to believe that a signed writing by the landlord was not required to terminate her liability for her personal guaranty to the landlord when the guaranty stated such writing was required.

In the alternative, a creditor can show that the debtor obtained money, property, services, or an extension, renewal, or refinancing of credit through "actual fraud," which "encompasses forms of fraud, like fraudulent conveyance schemes, that can be effected without a false representation." *Husky Int'l Elecs., Inc. v. Ritz*, 136 S. Ct. 1581, 1586 (2016). Although the term fraud "connotes deception or trickery generally, the term is difficult to define more precisely." *Id.* However, the fraud must be actual, not merely constructive to be excepted from discharge. "Scienter, or intent

to deceive," is a "required element under § 523(a)(2)(A) whether the claim is for a false representation, false pretenses, or actual fraud." *In re Freund*, 714 F. App'x 595, 597 (7th Cir. 2018).

The weight of the evidence falls far short of supporting the Plaintiff's allegation that she is the victim of an actual fraud. Nor has Ms. Aeschliman met her burden to prove that the Debtor acted with intent to deceive. The gist of the Plaintiff's claim here is that from the beginning the Debtor knew she would 'oust' the Plaintiff from the business and lulled her into contributing time, money and products to the company on the belief that the Plaintiff was a half-owner of the business. The Plaintiff, however, failed to establish at trial that the Debtor made any false representation or omission regarding Ms. Aeschliman's interest in the business.[8]

The Plaintiff has not shown that Healthy Habits ever had any profits or made any distributions or payments of salary to anyone, including the Debtor. In other words, even if the contributions were treated as in consideration of an equitable ownership interest in the LLC as the Plaintiff suggests she believed notwithstanding the lack of corporate documentation, there is no showing she was entitled to any distribution back, much less why the Debtor would be personally liable. Again, there is no showing that the Debtor received any profits or distributions from the company.

If anything, the evidence furnished at trial suggests an informal arrangement existed between the parties regarding the activities at the store where the

---

[8] And as discussed below, the Plaintiff failed to prove what specific products or property that she demanded and did not receive back. As to contributions of money towards the expenses of the business, the Plaintiff does not allege that she paid the Debtor individually, but rather to the business and does not explain why the Debtor, individually, would be liable to return investments to the Plaintiff.

contributions of each party to the business were taken as consideration for shared expenses. Most notably, they may have been taken in consideration of the rent that the LLC was directly liable for on the building out of which the Plaintiff was able to operate. In other words, the evidence suggests a de facto joint venture between the LLC and the Plaintiff to work together and share portions of shared costs for each to conduct their business at the leased property. This arrangement is consistent with the documentation, including the guarantees, at least on the assumption at the time that the joint venture would run indefinitely. That turned out not to be true and the joint venture terminated on June 18, 2017, with each party going their separate way.

Regardless, there was no showing that as of that point the Debtor was holding profits or property of the Plaintiff that she failed to return. The lease agreement shows that between May 2016 and June 2017 a total of at least $20,246.16 in rent and common charges would have come due. Thus, the $11,366.13 that the Plaintiff established she contributed to the business was approximately half of the rent during that period and only a fraction of the $45,552.39 that the Debtor established she had contributed as of that point. The Plaintiff did not attempt to show what, if any, income was generated by the business before Ms. Aeschliman's "ouster."[9]    And

---

[9] Or, for that matter, after. The Plaintiff testified very generally at one point that as inventory was sold, the money went "into the Healthy Habits bank account." But no testimony or other evidence was offered as to any specific amounts or what happened to such amounts. This despite the fact that the Plaintiff admitted receiving an accounting of the point-of-sale system reports from the Debtor during the course of discovery. At trial, counsel for the Plaintiff stated, "we've opted not to seek money necessarily related to the inventory because we'd be talking about 2 bottles of shampoo, and 3 of this and 6 of that and doing all sorts of math over very small amounts." The Plaintiff did testify, "I think when I added it up it was about $6,000 worth of inventory that I would have paid for it to put in – so for $12,000 in sales I would have paid $6,000 for that inventory," but she did not provide any foundation for her claimed recollection of this prior calculation. Nor is it clear what if any of the "inventory" was actually sold and whether any portion was among the materials she had retrieved on

significantly, the Plaintiff has failed to demonstrate that at the time of the dissolution of the parties' joint venture, Healthy Habits had property in excess of its liabilities to creditors, including its liabilities under its lease.  In the end, the Plaintiff simply failed to demonstrate that the Debtor had fraudulently schemed to divest the Plaintiff of money, property or an interest in her limited liability company.

## 11 U.S.C. § 523(a)(6).

Turning to Ms. Aeschliman's second nondischargeability claim, 11 U.S.C. § 523(a)(6) allows for a debt of the debtor to excepted from discharge if the debtor "willfully and maliciously injured the plaintiff or the plaintiff's property." *Gambino v. Koonce*, 757 F.3d 604, 607 (7th Cir. 2014) (citing *Jendusa–Nicolai v. Larsen*, 677 F.3d 320, 321 (7th Cir.2012)).  To prevail under this section, the plaintiff must prove by the preponderance of the evidence: "(1) an injury caused by the debtor (2) willfully and (3) maliciously." *In re Calvert*, 913 F.3d 697, 700 (7th Cir. 2019).  Malice requires a showing that the debtor acted "in conscious disregard of [her] duties or without just cause or excuse." *Id.* at 701.  The term "willful" in (a)(6) "modifies the word 'injury,' indicating that nondischargeability takes a deliberate or intentional *injury*, not merely a deliberate or intentional *act* that leads to injury." *Kawaauhau v. Geiger*, 523 U.S. 57, 61 (1998).  This is an objective standard and willfulness can be shown either where the "debtor's motive was to inflict the injury, or the debtor's act was substantially certain to result in injury." *Gerard v. Gerard*, 780 F.3d 806, 811 (7th Cir. 2015).  A willful injury is one the debtor "inflicted knowing he had no legal

---

or after June 15, 2017. The court finds this vague, self-serving testimony to be of questionable credibility and not persuasive.

justification and either desiring to inflict the injury or knowing it was highly likely to result from his act." *Larsen*, 677 F.3d at 324.

The Plaintiff asserts in her complaint that the Debtor injured her by "locking out Plaintiff and retaining the Property," alleging further that this "Property" consisted of "certain amounts of money and personal property" that "Plaintiff provided . . . toward the creation, construction, and operation of Healthy Habits." (Complaint ¶¶ 8, 16.) The Plaintiff demonstrated that she contributed $11,366.13 to Healthy Habits for business expenses for which she was not repaid but failed to prove that the Debtor individually had any duty to repay the Plaintiff for these amounts. There is no dispute that the Debtor "contributed" these funds to the limited liability company for its business.  Other than the $628.92 spent on products (mostly kombucha tea) that the Plaintiff purchased, the Plaintiff provided no evidence as to what the other contributions of $8,437.21 in cash and $2,300 in money orders were used for.  She furnished no evidence that those funds were used by the Debtor for her own personal benefit.  The Debtor's testimony that she never took a draw or salary from Healthy Habits is not disputed.

No evidence was offered to establish what, if any, income was earned by the business during its short life.  Rather, the record suggests that Healthy Habits' operation was supported to a significant extent by the contributions of the parties, and particularly of the Debtor.  The company had substantial recurring expenses and the uncontroverted testimony shows that the Debtor had contributed $45,552.39 to the business through June 2017.  To look at just one example, rent, the record reveals

that Healthy Habits owed its landlord at least $20,246.16 between May 2016 and June 2017 and at least $3,377.58 or more per month thereafter. The Plaintiff presented no evidence as to any specific revenues that that the company generated or that Healthy Habits was ever solvent or had any value as of June 2017. There is no showing that by the time Ms. Aeschliman and Ms. Vraney parted ways, both of their contributions to the business had not already been consumed by the business.

Assuming, per arguendo, Plaintiff's unsupported, indeed, unexplained, assertion that she believed contributions to the business somehow resulted in a debt owed her by the Debtor, in order to except that debt from discharge under subsection (a)(6), she must establish willfulness and malice. For relief here, the issue is not what the Plaintiff may have believed her contributions were for, but rather the Debtor's understanding and intent. If the contributions were intended as some form of investment or loan to the company, the Plaintiff failed to offer any explanation, let alone proof, how the failure of the company to repay her was a willful and malicious injury of the Debtor.[10]

With regard to the Plaintiff's claim for the value of personal property allegedly left at the store, the Plaintiff failed to prove that Ms. Vraney prevented her from recovering any property of specific identity and value. To the contrary, the Plaintiff's own testimony shows that she was given free access to remove property she contended

---

[10] Nor has the Plaintiff offered any proof to show that the Debtor is indebted to Plaintiff for the undetermined value of Debtor's time spent working for the business. It is undisputed that both parties worked at Healthy Habits from its formation until their break-up in June 2017 and no evidence has been presented to show that in fact Ms. Aeschliman was employed by the Debtor. At best, the scant evidence of their working arrangement suggests that the Plaintiff had considerable latitude as to what she did at the shop, including pursuing her own interests on the premises.

to be her own on both June 15 and June 18, 2017. Rather than deprive her of access, the testimony showed that even after these dates, the Debtor affirmatively reached out to the Plaintiff in late June when the Debtor discovered additional items left by the Plaintiff. The evidence shows that the Debtor provided Ms. Aeschliman with access and opportunity to retrieve these items in early July. Although the Plaintiff alleges that some of the items were rained on, she failed to demonstrate that the Debtor intended that they would be damaged. Nor did the Debtor provide any specifics as to what property was damaged by rain, including its value.

Finally, the Plaintiff's suggestion that the $12,000 the Plaintiff owes the landlord under her settlement agreement is somehow a willful and malicious injury attributable to the Debtor was similarly left unexplained at trial. Not surprisingly, inasmuch as this argument was belied by the undisputed fact that the Plaintiff had voluntarily given her personal guaranty to the landlord for which she was later sued. There is no showing that the the Debtor intentionally caused the company to breach the lease for the purpose of making the Plaintiff liable or had any role in the Plaintiff's eventual decision to settle with the landlord. Notably the Debtor also signed a personal guaranty of the lease. Moreover, this theory is inconsistent with the Debtor's credible testimony that the Debtor prepared, offered and signed the Personal Guarantee Release in an attempt to let the Plaintiff "off of [the lease] so she would not be responsible if . . . the business folded."

## <u>CONCLUSION</u>

The Plaintiff has failed to meet her burden of demonstrating that the Debtor is indebted to her for value obtained through misrepresentation, omission or actual fraud or as a result of her causing the Plaintiff willful and malicious injury. Accordingly, judgment shall be entered in favor of the Debtor.  A separate order shall be entered giving effect to the determinations reached herein.

DATE: March 31, 2019                          ENTER

_____

Thomas M. Lynch
United States Bankruptcy Judge